Matthew HELMS, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

NO. 2013–CA–001822–MR

Court of Appeals of Kentucky.

RENDERED: MAY 29, 2015; 10:00 A.M.

Discretionary Review Denied by Supreme
Court December 10, 2015

Briefs for Appellant: Erin Hoffman Yang, Assistant Public Defender, Dept. of Public Advocacy, Frankfort, Kentucky

Brief for Appellee: Jack Conway, Attorney General of Kentucky, John Paul Varo, Assistant Attorney General, Frankfort, Kentucky

BEFORE: ACREE, CHIEF JUDGE; KRAMER AND THOMPSON, JUDGES.

*OPINION*

THOMPSON, JUDGE:

Matthew Helms appeals from an order revoking his pretrial diversion and sentencing him to two years' imprisonment in accordance with his original sentence. He contends the Boyd Circuit Court abused its discretion when it voided his diversion agreement without considering whether violations of his conditions of diversion constituted a significant risk to prior victims or the community and whether he can be appropriately managed in the community as required by Kentucky Revised Statutes (KRS) 439.3106. He further contends that a zero-tolerance provision in the diversion agreement erroneously served as the basis for the trial court's decision.

Enacted in 2011 as part of the Public Safety and Offender Accountability Act, commonly referred to as HB 463, KRS 439.3106 provides:

Supervised individuals shall be subject to:

(1) Violation revocation proceedings and possible incarceration for failure to comply with the conditions of supervision

when such failure constitutes a significant risk to prior victims of the supervised individual or the community at large, and cannot be appropriately managed in the community; or

(2) Sanctions other than revocation and incarceration as appropriate to the severity of the violation behavior, the risk of future criminal behavior by the offender, and the need for, and availability of, interventions which may assist the offender to remain compliant and crime-free in the community.

The Commonwealth argues KRS 439.3106 does not apply to a trial court when considering revocation of supervised release. It further contends that even if the statute applies, there was sufficient evidence presented to meet the statutory criteria.

Helms was indicted on first-degree possession of a controlled substance, first offense, and having a prescription controlled substance not in its original container. The Commonwealth offered Helms a plea agreement in which it agreed that in exchange for Helms's guilty pleas, it would recommend a sentence of two years but that Helms be placed in the pretrial diversion program for two years. In September 2011, Helms entered guilty pleas to the charges.

On October 4, 2011, an agreed order of pretrial diversion was entered granting Helms diversion for two years. Among the conditions of Helms's diversion agreement was that Helms be supervised by the Department of Corrections (DOC), Division of Probation and Parole, not use or possess illegal drugs, alcohol or prescription drugs and be subject to random drug tests. The agreement further provided:

The Defendant and his counsel as evidenced by their respective signatures below fully acknowledge and agree that the terms of this diversion agreement shall be subject to a zero tolerance standard. Any deviation whatsoever from these terms shall result in setting aside this agreement in all respects.

On May 28, 2013, Helms's probation officer filed a probation violation report with the trial court indicating Helms violated conditions of his pretrial diversion by failing to mail in a releasee report in April 2013 and failing to pay supervision fees from June 2012 to May 2013. The officer also stated that Helms failed a random drug test on May 24, 2013, when he tested positive for suboxone and methamphetamines.

Based on that report, a warrant was issued for Helms's arrest. After the Commonwealth moved to revoke Helms's probation, on September 6, 2013, a revocation hearing was held at which probation and parole officers Jonathan Porter and Jason Ruggles testified.

Officer Porter, the assistant supervisor at the local probation office, testified Helms violated the condition of his probation by failing to report, failing to pay supervision fees, and using controlled substances. He explained that Helms tested positive for suboxone and methamphetamine on May 24, 2013, and signed a form admitting to his use.

Officer Porter testified that Helms was deemed a "low risk" offender and only required to report in person every three months. He testified that consistent with applicable administrative regulations, probation and parole officers use graduated sanctions for minor violations of conditions of release unless to do so would conflict with a court order. In Helms's case, graduated sanctions were not considered because of the zero-tolerance provision in the trial court's pretrial diversion order. He testified that although Helms's violations were considered minor, he interpreted the order to mean that any violation must be

brought back to court for possible voiding of the pretrial diversion agreement.

Officer Ruggles, Helms's probation officer, characterized Helms as cooperative but confirmed that on one occasion he failed to submit a report during a month he was not required to report in person and had not paid any supervision fees. He confirmed that Helms failed a random drug test.

When questioned on the use of graduated sanctions, Officer Ruggles testified that division policy requires officers to consider graduated sanctions unless they conflict with a court order. In Helms's case, he believed the trial court's pretrial diversion order precluded him from considering graduated sanctions. Like Officer Porter, Officer Ruggles understood the trial court's order to mean that his discretion to apply graduated sanctions could not be exercised because it would conflict with the zero-tolerance provision.

Helms did not contest the violations. He testified that he made a mistake and would be willing to attend drug treatment or comply with whatever conditions his probation officer required. He further testified he would be willing to begin his entire period of pretrial diversion anew.

At the conclusion of the evidence, the trial court questioned Helms regarding his violations. It reminded Helms that he "broke his word" by violating the pretrial diversion agreement.

Subsequently, defense counsel submitted a memorandum arguing that incarceration was improper under KRS 439.3106. While acknowledging the violations of the diversion agreement, counsel argued there was insufficient evidence to show Helms was a danger to the victim or community or that he could not be managed in the community.

On October 4, 2013, an order was entered sentencing Helms to two years pursuant to his original sentence. However, the trial court's order also stated: "An order shall follow regarding the Memorandum of Law filed by the Department of Public Advocacy."

On October 21, 2013, the trial court issued an order amending its prior order. In addition to reciting the facts, the trial court stated as follows:

> In the case at bar the defendant entered into a Diversion Agreement in which he was not to use illegal drugs. The agreement stated that there would be "zero tolerance" for such violations. There are reasons that prosecutors and Judges place such language in these agreements. These are in the truest sense contracts wherein each party has negotiated away benefits and exposed themselves to detriment upon breach. The Defendant in this case was given one last chance to change his behavior. The prosecutor and the Court also signed onto the agreement.

After noting it had the "power of contempt and revocation," the trial court added that the General Assembly did not intend to "remove a Court's authority to enforce its own Orders based on some administrative agency's internal procedures[.]"

Despite the trial court's repeated reference to the zero-tolerance provision, the trial court stated:

> The Defendant has consistently violated the terms of his diversion and the Court FINDS that the Defendant was in violation of this diversion for the allegations stated in the 5/24/2013 Special Supervision Report, and that such violations demonstrate the Defendant constitutes a significant risk to the public, especially due to the usage of Methamphetamine, that he cannot be properly managed within the community and that

the defendant's behavior demonstrates that there are no workable alternatives to incarceration available.

With the facts stated and the trial court's order subject to our review detailed, we begin our analysis.

■ Pretrial felony diversion is a unique opportunity for a qualified defendant to enter a guilty plea or an *Alford* plea to a qualified felony charge, yet, upon successful completion of the pretrial diversion period, not "be branded with a felony conviction[.]" *Tucker v. Commonwealth*, 295 S.W.3d 455, 457 (Ky.App.2009). "If the defendant successfully completes the provisions of the pretrial diversion agreement, the charges against the defendant shall be listed as 'dismissed-diverted' and shall not constitute a criminal conviction." *Commonwealth v. Derringer*, 386 S.W.3d 123, 126 (Ky.2012); (quoting KRS 533.258). The diversion agreement may be voided "[i]f the defendant fails to complete the provisions of the pretrial diversion agreement within the time specified, or is not making satisfactory progress toward the completion of the provisions of the agreement[.]" KRS 533.256(1). Whether to void a pretrial diversion agreement for a violation of its terms is to be determined by "the same criteria as for the revocation of probation, and the defendant shall have the same rights as he or she would if probation revocation was sought." KRS 533.256(2). Therefore, while distinguishable in significant ways from probation, the statutes and regulations applicable to revocation of probation and for voiding a pretrial diversion agreement are the same. For our purposes, probation and diversion are used interchangeably.

■ Revocation of probation does not require proof beyond a reasonable doubt. The Commonwealth's burden is to prove by a preponderance of the evidence that the defendant violated the conditions of his or her probation. *Murphy v. Commonwealth*, 551 S.W.2d 838, 841 (Ky.App.1977). Historically, once this burden was met, the decision to revoke probation has been within the trial court's discretion and not reversed unless that discretion had been abused. *Tiryung v. Commonwealth*, 717 S.W.2d 503, 504 (Ky.App.1986). On appellate review, the traditional test was simply whether "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999). Great deference was paid to a trial court's decision to revoke probation and was not an abuse of discretion if there was evidence to support at least one probation violation. *Messer v. Commonwealth*, 754 S.W.2d 872, 873 (Ky.App.1988).

Because Helms does not dispute that he violated the conditions of the pretrial diversion agreement, under the law as it existed prior to 2011, we would be bound to affirm the trial court. However, the statutory law governing supervised release underwent significant change in 2011, when the General Assembly adopted HB 463.

Faced with an increasing prison population and its associated costs, the General Assembly passed landmark legislation and declared a new sentencing policy of this Commonwealth. Focusing on rehabilitation rather than incarceration, it is now the policy to "maintain public safety and hold offenders accountable while reducing recidivism and criminal behavior and improving outcomes for those offenders who are sentenced[.]" KRS 532.007(1). In cases involving nonviolent drug offenses, "therapeutic intervention and ongoing individualized" treatment plans "shall" be used instead of incarceration. KRS 218A.005. To further this Commonwealth's penal policy, the statutory law regarding probation and other forms of supervised release under-

went significant change by creating KRS 439.3107 and companion statutes.

KRS 439.3107 instructs the DOC to "adopt a system of graduated sanctions for violations of conditions of community supervision" for the most common types of violations. Common violations include: failure to report, failure to pay fines and fees, and failure to refrain from the use of alcohol or controlled substances. *Id.* The statute instructs that the system of sanctions *"shall* take into account factors such as the severity of the current violation, the supervised individual's previous criminal record, the number and severity of any previous supervision violations, the supervised individual's assessed risk level, and the extent to which graduated sanctions were imposed for previous violations." *Id.* (Emphasis added).

Graduated sanctions is defined in KRS 446.010(21) as follows:

[A]ny of a wide range of accountability measures and programs for supervised individuals, including but not limited to electronic monitoring; drug and alcohol testing or monitoring; day or evening reporting centers; restitution centers; disallowance of future earned compliance credits; rehabilitative interventions such as substance abuse or mental health treatment; reporting requirements to probation and parole officers; community service or work crews; secure or unsecure residential treatment facilities or halfway houses; and short-term or intermittent incarceration[.]

As instructed by the General Assembly, the DOC set forth the factors a probation officer must consider when imposing graduated sanctions in 501 Kentucky Administrative Regulations (KAR) 6:250 Section 2, which directs as follows:

If the sentencing court orders the offender to be subject to graduated sanctions as part of the conditions of his probation, then to the extent that this administration regulation is not in conflict with the orders of the court, graduated sanctions shall be applied as follows:

(1) The officer shall consider the:

(a) Offender's assessed risk and needs level;

(b) Offender's adjustment on supervision;

(c) Severity of the current violation;

(d) Seriousness of the offender's previous criminal record;

(e) Number and severity of any previous supervision violations; and

(f) Extent to which graduated sanctions were imposed for previous violations.

The statutory and regulatory scheme contemplate that a probation officer first consider the factors and determine whether graduated sanctions are appropriate before reporting a violation to the trial court.

The Commonwealth maintains that once the graduated sanctions scheme created by the cited statutes and regulations is determined by the DOC to be inapplicable, HB 463 and its emphasis on rehabilitation versus incarceration is not applicable to a trial court considering revocation of supervised release. It contends that KRS 439.3106 is directed only to the DOC and does not limit the trial court's historically broad discretion. Our Supreme Court has recently rejected the Commonwealth's argument.

In *Commonwealth v. Andrews,* 448 S.W.3d 773 (Ky.2014), the Court held the "new criteria" in KRS 439.1306—consideration of whether a violation constitutes a significant risk to prior victims or the community at large and the ability to manage the defendant effectively in the community—applies to a trial court. Although lo-

cated in the "Probation and Parole" chapter and awkwardly worded, in clear and certain terms, KRS 439.1306 mandates that the trial court and the DOC's officers proceed in accordance with that statute. *Id.* at 777. It pointed out that the Commonwealth's interpretation would relegate the efforts on the part of probation and parole to avoid incarceration for minor violations to futility and irreconcilable with HB 463. It reasoned:

> [T]he Commonwealth's interpretation of KRS 439.3106 would prohibit a probation officer from seeking the highest sanction—revocation and incarceration—if the conditions of the statute were not met, yet permit a trial court reviewing a probationer's status to revoke and incarcerate under the very same circumstances. The Commonwealth offers no rationale for this "double standard," and we can conceive of none. Given that the authority to revoke probation is vested in the courts alone, it also seems particularly illogical that the legislature would place the burden of additional findings on probation officers but allow a trial court to disregard those findings.

*Id.* at 779. The Court noted that "[b]y requiring trial courts to determine that a probationer is a danger to prior victims or the community at large and that he/she cannot be appropriately managed in the community before revoking probation, the legislature furthers the objectives of the graduated sanctions schema to ensure that probationers are not being incarcerated for minor probation violations." *Id.*

██ In this post-*Andrews* case, we write with the settled law that KRS 439.3106 applies to trial courts and they must consider its criteria. Our initial question is whether within our new statutory scheme of rehabilitation versus incar-

ceration, a zero-tolerance provision can be reconciled with the statutory mandate.

As its name implies, under a zero-tolerance provision, a defendant's supervised release is automatically revoked upon a showing that he or she has violated a condition of release. It is analogous to a hammer clause defined in *Knox v. Commonwealth*, 361 S.W.3d 891, 893–94 (Ky. 2012), as follows:

> [A] hammer clause is a provision in a plea agreement which, in lieu of bail, allows the defendant, after entry of his guilty plea, to remain out of jail pending final sentencing. Generally, a hammer clause provides that if the defendant complies with all the conditions of his release and appears for the sentencing hearing, the Commonwealth will recommend a certain sentence. But, if he fails to appear as scheduled or violates any of the conditions of his release, a specific and substantially greater sentence will be sought.

The propriety of hammer clauses was considered in *Knox.* The Court noted that a plea agreement containing a hammer clause "poses inherent difficulties for the judiciary[.]" *Id.* at 899. The Court stressed that when considering sentencing, under the criminal statutes and rules, the Court is required to exercise its independent discretion in sentencing. *Id.* at 897–98. Despite rebuking such clauses in plea agreements, the Court concluded because the Commonwealth's power to negotiate a plea agreement is a power of the executive branch, the judiciary cannot bar the use of such clauses in the plea negotiating process. *Id.* at 899.

However, the Court held that "a judge's commitment to impose a sentence based upon a defendant's breach of a hammer clause condition, coupled with the imposition of that sentence without proper consideration of the other relevant factors, is

an abuse of judicial discretion." *Id.* Therefore, "[w]hen presented with a plea agreement with a hammer clause, the trial judge should accord it no special deference, and shall make no commitment that compromises the court's independence or impairs the proper exercise of judicial discretion." *Id.* at 900.

■ A zero-tolerance provision presents the same inherent difficulties and runs afoul of the expressed language in the statutes created by HB 463 and the General Assembly's intent. As stated by the Court in *Andrews,* the language of KRS 439.3106 is "unqualified[.]" *Andrews,* 448 S.W.3d at 779. The Court held that even "[i]f the court's order of probation was silent as to the imposition of graduated sanctions, the statute nevertheless applies upon consideration of probation revocation." *Id.*

■ Likewise, a zero-tolerance provision cannot shed a trial court of its statutory duty to consider the criteria of KRS 439.3106. "[T]he judge who warns the defendant entering into a guilty plea that specific future conduct will result in [incarceration] has drawn a line in the sand and dared the defendant not to cross it." *Knox,* 361 S.W.3d at 899. After HB 463, a trial court is not permitted to follow an unbending predetermined outcome but must consider the danger to the defendant's victim or the community and the possibilities of rehabilitation in the community. Although a trial court's discretion to manage probation is not "upended," that discretion must be "exercised consistent with statutory criteria." *Andrews,* 448 S.W.3d at 780.

■ As did our Supreme Court in *Knox,* we stop short of holding that zero-tolerance provisions in diversion agreements are barred but do so only because such a holding would admittedly render our opinion subject to attack under the separation of powers doctrine. *Knox,* 361 S.W.3d at 899. However, a judge's commitment to a predetermined outcome upon a violation of a condition of diversion without consideration of KRS 439.3106 is an abuse of discretion.

We are aware that because zero-tolerance provisions are not barred, they may continue to be inserted in diversion agreements. Therefore, we would be remiss if we did not address a subsidiary issue and one not directly presented on appeal regarding the effect of a zero-tolerance provision on a probation and parole officer's consideration of graduated sanctions in lieu of filing a violation report with the trial court.

This case exemplifies the possible difficulty for probation and parole officers. Officers Porter and Ruggles testified that they believed the zero-tolerance provision precluded them from considering graduated sanctions. *See* 501 KAR 6:250 Section 2. We may or may not agree with that interpretation. However, it is not an unreasonable interpretation and it is possible that in the future, probation and parole officers will afford a zero-tolerance provision the same meaning. Consequently, comment is warranted on the effect of a zero-tolerance provision on the initial determination regarding graduated sanctions by a probation and parole officer.

■ Logically, if a court cannot revoke supervised release solely on a zero-tolerance provision, probation and parole officers cannot find graduated sanctions are not available based on that same provision. It would be incongruous to say the Court may not consider such provisions but, based on that same provision, permit a probation and parole officer to reject graduated sanctions. Such an application would render KRS 439.3107 and 501 KAR

6:250 "meaningless or ineffectual." *Andrews*, 448 S.W.3d at 779.

■ In Helms's case, the trial court orally and in its written order expressed that it was enforcing the zero-tolerance provision. However, in the end, its final order parroted the statutory language that Helms's violations demonstrate he is "a significant risk to the public" and "that he cannot be properly managed within community and that [his] behavior demonstrates that there are no workable alternatives to incarceration[.]" Thus, the trial court was aware of the KRS 439.3106 criteria and stated the ultimate findings of fact in its order.

■ If the penal reforms brought about by HB 463 are to mean anything, perfunctorily reciting the statutory language in KRS 439.3106 is not enough. There must be proof in the record established by a preponderance of the evidence that a defendant violated the terms of his release and the statutory criteria for revocation has been met.

The Commonwealth contends that Helms's single positive drug test for methamphetamine was sufficient evidence that he presented a risk to the community because he has a "drug problem" and cannot be appropriately managed in the community because of his minor violations. Its argument is antithetical to the purpose of HB 463.

Helms is an admitted illegal drug user. However, the diverted charge was his first offense. The record is devoid of any evidence that Helms would not benefit from drug treatment or that he would not cooperate in such treatment. To the contrary, he stated he would cooperate with all conditions of his diversion, including treatment. His probation officer confirmed that Helms was cooperative and, absent the zero-tolerance provision in the trial court's order, the officer would not have sought revocation. Helms is precisely the type of defendant the General Assembly envisioned benefitting from the rehabilitative measures contained in HB 463.

In *Andrews*, the Court made clear that a decision to revoke probation based solely on a single violation of the condition that the defendant remain drug-free, will be deemed "an abuse of discretion under the new state of the law." *Id.* at 780. While Helms also committed two technical violations by not mailing a single report and not paying supervision fees, neither violation presents a danger to the community nor indicates that his drug use cannot be adequately managed in the community. Until his one-time drug use and technical violations of the conditions of his diversion, Helms had been adequately managed within the community for 18 months. Because there is a complete lack of evidence in the record that Helms is a danger to a prior victim or to the community and he cannot be appropriately managed in the community, the decision to void the diversion agreement and impose a two-year sentence of imprisonment was an abuse of discretion.

The order voiding Helms's pretrial diversion agreement and imposing a sentence of two years' imprisonment is reversed. The case is remanded for consideration of sanctions other than imprisonment.

ALL CONCUR.