RENDERED:  AUGUST 28, 2020; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-001066-MR AND NO. 2019-CA-001081-MR

KATHRYN SWENSON                                                    APPELLANT


APPEALS FROM HARDIN CIRCUIT COURT
v.          HONORABLE KELLY MARK EASTON, JUDGE
ACTION NOS. 18-CR-00022 AND 18-CR-00244


COMMONWEALTH OF KENTUCKY                                           APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CALDWELL, JONES, AND KRAMER, JUDGES.

KRAMER, JUDGE:  Pursuant to an order entered July 8, 2019, the Hardin Circuit Court found Kathryn Swenson in violation of her probation.  In lieu of having her probation consequently revoked, Swenson had requested a graduated sanction consisting of "up to" twelve months' incarceration, suspended upon condition that she complete "a long-term rehab" program for drug addiction.  The circuit court

denied Swenson's request, however, and ordered Swenson to serve the term of her previously probated sentence, *i.e.*, twenty years' imprisonment, with eligibility for parole upon serving twenty percent. Swenson now appeals, arguing her probation was solely revoked because the circuit court unfairly enforced what she characterizes as an unwritten "zero tolerance policy" for drug use associated with her probation. In other words, Swenson's claim is that her probation was only revoked because she used methamphetamine on one occasion during her probation. Having thoroughly considered the record, her arguments lack all merit; hence, we affirm.

We review probation revocation orders under the abuse of discretion standard. *Commonwealth v. Andrews*, 448 S.W.3d 773, 780 (Ky. 2014). We will reverse only if we find "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). We "will not hold a trial court to have abused its discretion unless its decision cannot be located within the range of permissible decisions allowed by a correct application of the facts to the law." *Blankenship v. Commonwealth*, 494 S.W.3d 506, 508 (Ky. App. 2015) (citing *Miller v. Eldridge*, 146 S.W.3d 909, 915 (Ky. 2004)).

Kentucky Revised Statute (KRS) 439.3106 provides the criteria for revoking probation, stating in relevant part:

Supervised individuals shall be subject to:

> (a) Violation revocation proceedings and possible incarceration for failure to comply with the conditions of supervision when such failure constitutes a significant risk to prior victims of the supervised individual or the community at large, and cannot be appropriately managed in the community; or

> (b) Sanctions other than revocation and incarceration as appropriate to the severity of the violation behavior, the risk of future criminal behavior by the offender, and the need for, and availability of, interventions which may assist the offender to remain compliant and crime-free in the community.

KRS 439.3106(1).

The *Andrews* Court considered the applicability of this statute to revocation proceedings and held that "KRS 439.3106(1) requires trial courts to consider whether a probationer's failure to abide by a condition of supervision constitutes a significant risk to prior victims or the community at large, and whether the probationer cannot be managed in the community before probation may be revoked." *Andrews*, 448 S.W.3d at 780.

Here, Swenson does not – and, indeed, cannot – contest that she failed repeatedly to abide by the conditions of her probation. Nevertheless, she asserts the circuit court erred by revoking her probation rather than issuing the graduated sanction she requested because, in her view, her failures did not indicate she

constituted a significant risk to prior victims or the community at large, or that she could not be managed in the community.

Given the twenty-year sentence of imprisonment, and in light of the fallacy of her arguments that the circuit court had predetermined her case by having a "zero tolerance policy," we set out in detail the extent of the exhausting opportunities the circuit court gave Swenson to receive treatment and remain on probation. Upon a thorough review of the record, it cannot be seriously doubted that the circuit court went far beyond complying with only the bare requirements of KRS 439.3106(1) and that the keys to remaining on probation were repeatedly handed to Swenson.

In case No. 18-CR-00022, Swenson pled guilty in Hardin Circuit Court to committing, on or about December 28, 2017, the offense of receiving stolen property under $10,000 (a class D felony). *See* KRS 514.110. On January 12, 2018, she was released on bond. Thereafter, in case No. 18-CR-00244, Swenson pled guilty to committing nineteen more criminal offenses against several more individuals in Hardin County over a sixty-day period between December 2017 and February 2018. Further, she admitted committing many of those additional offenses shortly after being allowed pretrial release from custody on January 12, 2018.[1]

---

[1] The specifics of her latter guilty plea are summarized below:

- On January 13, 2018, in violation of KRS 514.150, Swenson possessed United States mail matter of S. Soppeland while knowing or having reason to know it was stolen (a class D felony);
- On January 13, 2018, in violation of KRS 514.110(3), Swenson possessed stolen property under $500 by knowingly possessing checks of C. Worthington while knowing or having reason to believe the checks were stolen (a class A misdemeanor);
- On January 13, 2018, in violation of KRS 514.150, Swenson possessed United States mail matter of L. Baker while knowing or having reason to believe it was stolen (a class D felony);
- On January 13, 2018, in violation of KRS 514.110(3), Swenson possessed stolen property under $500 by possessing a Garmin GPS valued at less than $500, belonging to D. Fryman, while knowing or having reason to believe it was stolen (a class A misdemeanor);
- On January 13, 2018, in violation of KRS 514.110(3), Swenson possessed an HP laptop computer valued at less than $500, belonging to J. Townsend, while knowing or having reason to believe it was stolen (a class A misdemeanor);
- On January 13, 2018, in violation of KRS 511.040, Swenson committed third-degree burglary by knowingly and unlawfully entering or remaining in a building located at 561 S. Deepwood Drive, Radcliff, with intent to commit a crime (a class D felony);
- On January 13, 2018, in violation of KRS 514.110(3), Swenson possessed a Garmin GPS valued at less than $500, belonging to R. Washburn, while knowing or having reason to believe it was stolen (a class A misdemeanor);
- From January 26 until February 2, 2018, in violation of KRS 514.030, Swenson took and exercised control over a 2014 Ford F-150 truck valued over $10,000, belonging to Big M Chevy, with intent to deprive the owner thereof (a class C felony);
- On January 25, 2018, in violation of KRS 514.030, Swenson took and exercised control over an LG cellular telephone valued under $500, belonging to G. Cravens Kos, with intent to deprive the owner thereof (a class A misdemeanor);
- On January 13, 2018, in violation of KRS 514.110(3), Swenson knowingly possessed credit cards belonging to L. McCrobie, valued under $500, while knowing or having reason to believe the cards were stolen (a class A misdemeanor);
- On December 17, 2017, in violation of KRS 514.110, Swenson possessed a 1995 Chevrolet truck belonging to G. Kersey, valued over $500, while knowing or having reason to believe the vehicle was stolen (a class D felony);
- On December 24, 2017, in violation of KRS 514.110, Swenson possessed a 1999 Chevrolet S-10 truck belonging to L. Clark, valued over $500, while knowing or having reason to believe the vehicle was stolen (a class D felony);
- On December 23, 2017, in violation of KRS 514.110, Swenson possessed a 2010 Chevrolet Cobalt belonging to S. Soppeland, valued over $500, while knowing or having reason to believe the vehicle was stolen (a class D felony);
- On December 26, 2017, in violation of KRS 514.110, Swenson possessed a 2007 Chevrolet Cobalt belonging to S. Dailey, valued over $500, while knowing or having reason to believe the vehicle was stolen (a class D felony);

On April 27, 2018, the circuit court sentenced Swenson to five years' imprisonment in 18-CR-00022 and fifteen years' imprisonment in 18-CR-00244, to run consecutively for a total of twenty years, with parole eligibility upon serving twenty percent. But, the circuit court also noted Swenson was addicted to methamphetamine and that her addiction had been part of what had motivated her to commit her offenses. Accordingly, it referred Swenson to felony drug court and, provided Swenson was accepted, agreed to probate her sentence for a period of five years or longer to enable her to complete the program.

However, because of what the circuit court noted was "the extreme nature of her addiction," and also because Swenson had previously been enrolled in the misdemeanor drug court program in 2014 and had failed to complete it,[2]

- Between December 20, 2017 and January 13, 2018, in violation of KRS 514.030, Swenson took or exercised control of a W-2 tax form belonging to T. Lawson, valued under $500, with intent to deprive the owner thereof (a class A misdemeanor);
- On December 20, 2017, in violation of KRS 511.030, Swenson committed second-degree burglary by knowingly and unlawfully entering or remaining in the residence of S. McMillen and committing a theft (a class C felony);
- Between January 13 and January 31, 2018, in violation of KRS 514.170, Swenson committed the offense of trafficking in stolen identities (a class C felony);
- Between January 26, 2018 and February 2, 2018, in violation of KRS 514.150, Swenson possessed United States mail including an IRA account statement, credit card application, mortgage documents, and other mail matter of H. Owens while knowing or having reason to believe it was stolen (a class D felony); and
- Between January 26, 2018 and February 2, 2018, in violation of KRS 514.150, Swenson possessed United States mail including SNAP account documents of J. Owens while knowing or having reason to believe it was stolen (a class D felony).

[2] On February 24, 2014, Swenson was found guilty of misdemeanor public intoxication from controlled substances, and she was thereby found to have violated the terms of a probation she had already been serving from an earlier misdemeanor drug offense she had committed in 2012.

Swenson was placed on a "waiting list." A precondition of acceptance into the felony drug court program was to complete a long-term drug treatment program and reside for six to nine months at a Recovery Kentucky center beforehand.[3] After explaining this precondition to Swenson at the conclusion of the April 27, 2018 hearing, the circuit court added:

> COURT: I don't want to waste time. And I want to be very honest with you, I have grave doubts about whether you will ever do this. I think you just want out, and the minute you get out, you're gonna be gone. And if you do, you're going to prison for twenty years. Do you understand me?
>
> SWENSON: Yes, sir.
>
> COURT: Now, don't waste our time. Because there are other people who really want to get better, and, you know, if you go to an RKC, you're gonna be there and probably with the addiction problem you have it's probably gonna be for the most time, you may be there for nine months, and I don't know for how long. And, it's not like being out. It's a treatment center. And you

She was sentenced to ninety days' imprisonment and two years' probation, but upon her request her sentence was suspended. Her probation was extended to enable her to complete the misdemeanor drug court program. As discussed below, she ultimately chose to serve her suspended sentence and voluntarily terminated her participation in the misdemeanor drug court program in May 2016.

[3] While this precondition for participation in felony drug court is not set forth in the written volumes of record in this matter, it was extensively discussed at hearings held by the circuit court on April 27 and August 14, 2018; and at the June 25, 2019 revocation hearing, Swenson acknowledged:

COUNSEL: What was the reason why you didn't get accepted into drug court?
SWENSON: I had already been in treatment court before.
COUNSEL: How long ago was that?
SWENSON: 2014.

can't leave.  You have to successfully complete it.
Because if you don't complete it, not only are you not
going to get into drug court, you'll be terminated from
that, you're going to prison for twenty years.  I just want
to be fair with you because I don't want you to waste
your time.  If you're playing, don't play.  You're gonna
lose, alright?  Do you understand what I'm telling you?

SWENSON:  Yes, sir.

COURT:  Now, do you really want treatment?

SWENSON:  Yes, sir.

On May 1, 2018, the circuit court entered an order granting Swenson

probation and a conditional discharge – conditions that, among other things,

included:  (1) being "subject to graduated sanctions imposed by Probation and

Parole in accordance with 501 KAR[4] 6:250"; (2) remaining within the area as

directed by her probation officer; (3) reporting to her probation officer as directed;

(4) obeying all rules and regulations imposed by Probation and Parole; (5)

submitting "to periodic drug and/or alcohol testing because [Swenson's] record

indicates a drug and/or alcohol problem"; and, in conformity with what was

discussed at the hearing, (6) successfully completing the felony drug court program

and residential treatment.  To fulfill the precedent condition of six to nine months

of treatment for acceptance into the felony drug court program, the circuit court

entered another order on May 14, 2018, directing Swenson to report to the Trilogy

---

[4] Kentucky Administrative Regulations.

-8-

Recovery Center for Women and "to complete any and all requirements and follow all rules of Trilogy while in residence there. . . . If [Swenson] fails to complete the program, [Swenson] shall be placed into custody and returned to the Hardin County Detention Center and remain until further orders of the court."

Swenson then resided at Trilogy until June 8, 2018. On that date, Swenson's probation officer, Deonna Davie, received a discharge report from Trilogy stating Swenson had been terminated without completing the program due to "receiving several behavior contracts."[5] Three days later, Swenson reported to Officer Davie and was taken into custody.

Following an ensuing motion from the Commonwealth to revoke Swenson's probation, the circuit court held a hearing on August 17, 2018. There, Swenson's then-current probation officer, Darren Payne, testified the report from Trilogy had not identified the specifics of Swenson's behavioral infractions and that a Recovery Kentucky center such as Trilogy could assess behavioral contracts for a wide range of conduct, including "poor attitude," "not attending meetings," "threatening behaviors," or simply not making a bed correctly. He further testified, however, that Swenson had received a total of *nineteen* behavior contracts between May 15 and June 8, 2018 and that before Swenson had previously terminated

---

[5] Probation Officer Darren Payne testified during the August 17, 2018 hearing that a "behavior contract," in this context, is essentially a chore or other task that a resident is required to perform due to poor behavior.

-9-

herself from misdemeanor drug court in May 2016, she had received four other sanctions at two other Recovery Kentucky centers during her participation in that program, too. Considering the number of times Swenson had been sanctioned, along with her prior non-completion of misdemeanor drug court, Officer Payne opined Swenson was not amenable to treatment; thus, she could not be effectively managed in the community for purposes of probation.

Swenson, for her part, insisted she had been assessed behavior contracts for minor offenses, such as not regularly making her bed, forgetting a book or a raincoat, bothering another resident about cigarettes, or "cleanliness issues." She claimed she had been unfairly singled out by the individuals who issued the behavior contracts. She represented that she had completed all but five of her behavior contracts. She asserted she had been suffering from post-traumatic stress disorder for the past eight years, as well as bipolar depression, which she believed contributed to her behavioral difficulties and prior drug use. She also suggested another Recovery Kentucky center, re-NEST, would be a better environment for her, and she asked to be placed there instead.

However, Swenson did not contest the validity of Trilogy's decision to terminate her from its program. Discussing that matter further with Swenson during the hearing, the circuit court stated:

> COURT: So, these behavior contracts you had, five of them remained unfulfilled when you were discharged. Is

that the right way to say it?  You didn't complete them?  They remain broken?

SWENSON:  Yes, sir.

COURT:  And which ones were those again?

SWENSON:  I'm not for certain, exactly.

COURT:  I mean, you had so many.  I mean, it's hard to keep up if you had nineteen contracts.  I've never heard that before.  I send people to Trilogy all the time, I send people to other places, I have never heard that many behavioral contracts in that many days.  That's a record.  And that's about you.  It's not about the staff, it's not about the other people there.  It's about you.  So that's the problem.  How in the world can I send you back to Trilogy when that's the behavior I can expect?

The circuit court also questioned Swenson regarding whether she had ever voluntarily sought treatment for the psychological issues that allegedly contributed to her behavior problems:

COURT:  In the last eight years, how many times did you seek treatment in the form of therapy to deal with your PTSD?  Not something court-ordered, or that probation told you to do.  I want to know what you did in the last eight years to better your condition.

SWENSON:  I seeked [sic] treatment one time through Dr. Amedi Radcliff.

COURT:  Okay.  What was that?

SWENSON:  Um, they prescribed me a Xanax, a smallish dose.  Then I was not able to take it as prescribed, so I never went back.

-11-

COURT:  What do you mean you were "not able to take it as prescribed"?

SWENSON:  As an addict, I overdid it.

COURT:  Of course.  Right?  So, you see what I'm getting at here.  Was there any therapeutic approach, any time you would meet with a counselor to talk about it?  Because believe it or not, there is no pill that cures PTSD.  Some of it is therapy to deal with the trauma.  Have you ever engaged in therapy about your PTSD?

SWENSON:  Recently in December, I was seeking to arrange an advocate, who eventually arranged to come down to the jail and speak to me.

The circuit court also questioned Swenson regarding her decision to voluntarily terminate herself from the misdemeanor drug court program in May 2016:

COURT:  When you were in drug court the first time, if I understood you correctly, you had sanction after sanction and at some point, they wanted you to do long-term treatment?

SWENSON:  Yes, sir.

COURT:  And where was that?

SWENSON:  They wanted me to go to Freedom House.

COURT:  Okay.  And you didn't want to?

SWENSON:  No, sir.

COURT:  Why not?

-12-

SWENSON:  I was seven months pregnant, my time on the shelf was less, and I didn't want to have to drag two kids to drug test at six o'clock in the morning.

COURT:  Sounds like excuses to me.

SWENSON:  It was.

COURT:  It is.  Did you think you were better off, seven months pregnant, not being engaged in treatment in Freedom House?

SWENSON:  No, sir.

COURT:  So, what happened then?

SWENSON:  I served out my time.

COURT:  Was the baby born in prison?

SWENSON:  No, I was released in time.

COURT:  Because you had done the math, and you'd said, "Okay, I can get out, have the baby, and go on with my life."  How long did that last?

SWENSON:  About three months.  I relapsed.

COURT:  What did you relapse on?

SWENSON:  Methamphetamines.

After reviewing the evidence, the circuit court decided against revoking Swenson's probation or requiring her to serve an alternate sentence; instead, it granted her request to be placed at re-NEST.  The court's findings in this

-13-

regard, pronounced orally from the bench at the conclusion of the hearing, were as

follows:

> So, my thought is this. I have to go through a three-part analysis first. Do the violations we have seen, do they indicate a risk of, a risk to prior victims of this defendant? Well yes, they do, because they show a present either unwillingness or inability to engage in treatment effectively.
>
> Or do they create a danger or risk to the community as a whole, which includes the defendant herself as part of the community? No doubt that's true. No one ever stopped this defendant from seeking out therapy. No one ever stopped her from doing that. And it seems to be like, "Well, when I'm forced to do something, I'll do it and I'll do it badly." I've never heard of nineteen contracts in seventeen days, it's just incredible.
>
> But ultimately the final factor I'm gonna have to deal with is, I must make a finding that the defendant cannot be managed appropriately in the community with probation alternatives. I have no doubt if I make the finding today that I believe this defendant cannot be managed appropriately in the community, an appellate court would uphold that decision on this record. Without doubt. Because I've had these situations before where this person will not engage, will not do it. The fact that there's something out there you can send the person to is not the deciding factor, it's whether the defendant can be managed appropriately in the community, and some of that depends on their own issues of not being a procrastinator and not making excuses, but actively engaging in the treatment that's available.
>
> So, that's where I'm on the border. I mean, the Commonwealth's on the border about just revoking this probation, which would certainly be justified. Or doing an alternate sentence, which would also be justified. I'm

on the border of just trying to believe that another opportunity at a treatment placement should be provided to this defendant, because that means someone else who may be much more motivated and much more willing to engage in treatment will not get that bed. And that's what, those are the things that make me think when I make these decisions, I've got just so few places that we can send people to for treatment, and if I send somebody when it is not gonna be anything but, "Let me out of jail, get me out of jail, whatever I have to say or do to get me out of jail," and then as soon as they're there they go right back to the same things they did, they get terminated, and then I've wasted that limited spot.

So, when I look at the fact that this is a twenty-year sentence we're dealing with, one of the reasons I've decided I'm not going to do the alternate sentence approach is because I'm concerned about the defendant doing the math. If I do an alternate sentence and she then gets out, goes back on probation, then it's more tempting to just do what she's done before: "Well, I can do this much time and get out and go back to doing whatever I want, or can decide differently."

So, I would like to be hopeful, but I kind of share [the Commonwealth's] hesitation, wondering if this defendant will truly ever engage in treatment. But ultimately, since there is an available spot at re-NEST, I'm going to order that she go to re-NEST. However, I'm going to direct that probation and parole must receive weekly reports while she is at re-NEST. Upon any violation of their rules, she will be detained by the probation officer, there will be no reason to get a warrant.

In other words, I will direct the probation officer, if re-NEST calls and says, "We've got a problem, we've got five behavioral contracts," she will be detained, we'll come back in here, and I think from everything that's been said today we know what will happen then. Of course, we don't know until something happens, but I

don't know what the next option will be.  So, as I said, I will order her to be transported from the jail to re-NEST when they confirm there is a spot available for her, and I want that to be followed closely by probation and parole because I'm, there's a part of me that's like, I think she'll go and run as soon as she can.  Okay?  So, hopefully she'll prove me wrong.  Hopefully she'll prove [the Commonwealth] wrong.  I don't really enjoy the thought of sending her away to prison for twenty years, but I'll do it if I have to.

In short, after reviewing Swenson's criminal history and the course of her various probations, the circuit court remained concerned that Swenson would continue the pattern of behavior that had led her to commit multiple offenses and that Swenson's behavior would prevent her from receiving treatment absent incarceration:  She would only undergo treatment if forced to do so; she would only put forth minimal effort during treatment; given the choice – and to her detriment – she would choose freedom over drug treatment; and she would remain unwilling to accept responsibility.

Nevertheless, in its post-hearing order of August 20, 2018, the circuit court decided against revoking Swenson's probation and instead approved her transfer to re-NEST, stating in relevant part:

### FINDINGS OF FACT

The defendant failed to abide by the terms and conditions of probation by committing the following violations: another failure to complete treatment at Trilogy – more than a dozen behavior contracts during short residence resulted in termination.

## CONCLUSIONS OF LAW

The Defendant was afforded the opportunity for a hearing pursuant to KRS 533.050. In determining whether to revoke the Defendant's probation or to assess a penalty or conditions other than revocation, the Court has considered the requirements of KRS 439.3106 and finds: sanctions other than revocation and incarceration as appropriate to the severity of the violation behavior, the risk of future criminal behavior by the offender, and the need for, and availability of, interventions which may assist the offender to remain compliant and crime-free in the community.

## ORDER

WHEREFORE IT IS ORDERED that the sentence of probationary supervision is hereby: Not revoked, and in lieu of revocation, the Court hereby imposes the following Alternate Sentence and/or modification of conditions: given the lengthy sentence the Deft. will serve if she does not engage in treatment, court decided to allow door-to-door placement at re-NEST.

However, on November 16, 2018, Swenson was discharged from the re-NEST program. Consequently, Officer Payne submitted a November 20, 2018 violation of supervision report, once again recommending the revocation of Swenson's probation. A bench warrant was issued the same day for her arrest. But, the Commonwealth did not move to revoke Swenson's probation; no revocation hearing was held; and the circuit court later recalled the bench warrant in a December 13, 2018 order "due to the Defendant being compliant with Probation and Parole." The circuit court's order further stated, "The Defendant

-17-

enrolled in Serenity Place after having to leave the Re-Nest [sic] Treatment facility due to having medical issues and has been checking in regularly with her Probation Officer. If the Defendant fails to comply with treatment she shall be placed into custody and taken to Hardin County Detention Center where she will remain until further orders of the court." Thus, "having medical issues," and Swenson's relocation from re-NEST to "Serenity Place"[6] – apparently a third treatment facility that probation and parole allowed her to attend – were enough for the circuit court to justify withdrawing Swenson's arrest warrant.

However, this point requires further discussion. During the subsequent probation revocation proceedings of June 25, 2019, the circuit court would later cite Swenson's failure to remain a resident at re-NEST as an example of Swenson "doing the math," demonstrating she was more interested in freedom than treatment – just as she did in May 2016 by voluntarily terminating her participation in misdemeanor drug court. To explain, the only statement from re-NEST regarding why Swenson had been discharged from its program is set forth in a November 20, 2018 letter its program coordinator submitted to Officer Payne. In relevant part, it stated:

> Ms. Swenson was exhibiting continuous behaviors not
> conducive to recovery, such as dishonesty and

---

[6] During the various hearings in this matter, this facility was intermittently referred to by the circuit court and parties as "Serenity Place," "Serenity Sisters," and "Serenity Girls."

manipulation.[7]  We suggested that she restart the program due to these behaviors.  She was unwilling to comply, and left the program Against Medical Advice.

During her subsequent June 25, 2019 revocation hearing, Swenson was, for the first time, confronted with this statement and required to testify regarding why she had chosen to leave re-NEST.  There, she denied engaging in any kind of dishonest or manipulative behavior, and she insisted re-NEST had advised her in November 2018 that it would be necessary to restart its program for reasons associated with a bladder surgery she needed to undergo around that time.[8,9]  The point the circuit court would eventually make in citing this detail, however, is that re-NEST *had* advised Swenson it would be necessary for her to restart its rehabilitation program and that rather than accepting re-NEST's advice,

---

[7] An itemized list of Swenson's behavioral infractions was not provided by re-NEST, but Officer Payne stated in his report that they included Swenson's refusal to surrender her cellular telephone while residing at the facility.

[8] In this respect, at the June 25, 2019 hearing, Swenson testified:

> When I left re-NEST, I went to Serenity Girls, I got myself, it was a Friday to a Monday, I let Darren Payne know what was going on.  I was gonna need surgery for IC bladder issues at the, re-NEST, that's why they told me my original restart was gonna have to happen, because if I had surgery and had any kind of medication prescribed to me, I would need to have a restart anyhow.  So, I got myself into Serenity Girls with Billy-Jo, because she said she would allow me to take medication and all I had to do is complete the program.  I completed the program February 3rd.

[9] In her appellate brief, Swenson now represents she departed re-NEST because the facility was unable "to accommodate her pregnancy."  If Swenson was pregnant during this time, or if she intended to mean that her "IC bladder issues" were occasioned by a pregnancy, it is not reflected in the record.

-19-

Swenson sought to reside at Serenity Place – a facility that would *not* require her to restart rehabilitation.

In any event, the record contains no documentation from Serenity Place, but Swenson testified that in February 2019, she was permitted to leave the facility and continue her treatment (*i.e.*, the prerequisite for her enrollment in the felony drug court program) while residing in an apartment with a coworker for a month, and then in an apartment of her own until June 2019. Officer Payne also verified Swenson later completed her prerequisite treatment in April 2019; had thereafter remained on the waiting list for enrollment into felony drug court; and that between February and June 2019, he had also permitted Swenson to occasionally drive to Indiana to visit with one of her minor children.

Keeping that in mind, on May 31, 2019, Officer Payne submitted another violation of supervision report and an accompanying affidavit, noting Swenson had violated her probation in two more respects. First, if Swenson received any new charges, the terms of her probation required her to report it to her probation officer within seventy-two hours. And, Officer Payne noted, he had discovered on his own that Swenson had been arrested in Indiana on February 23, 2019, on charges of public intoxication and reckless driving. In other words, Swenson had not reported those charges to him at all. Officer Payne stated that as a graduated sanction for the violation he had required Swenson "to complete 30

Community Service Hours within the next 12 months." Payne added that

Swenson's Indiana charges remained unresolved and that a pre-trial conference

had been scheduled in Indiana for June 5, 2019.

As to the second violation, Officer Payne recommended revoking

Swenson's probation for the following reason:

> Kathryn Swenson reported to the office of Probation and
> Parole on May 30, 2019. At that time, Ms. Swenson was
> asked to submit to a random drug screen. Ms. Swenson
> was unable to produce a sample for testing at that time.
> Ms. Swenson was advised to return to the office on May
> 31, 2019 at 8 AM to produce a sample for the drug
> screen. Ms. Swenson failed to show for the appointment
> and has not made contact with this Officer.
>
> . . .
>
> Kathryn Swenson has been afforded every opportunity to
> comply with Probation and Parole. Ms. Swenson has
> failed to comply numerous times with directives from the
> Court and Probation and Parole. Due to Ms. Swenson's
> inability to comply with directives on numerous
> occasions, the use of Graduated Sanctions are no longer
> appropriate at this time.

On June 3, 2019, the circuit court issued a warrant for Swenson's

arrest for failing to report to her probation officer for drug testing. She was

arrested on June 7, 2019. After being taken into custody, Swenson was provided a

drug screen at the Hardin County Detention Center and tested positive for

methamphetamine. Subsequently, the Commonwealth moved to revoke her

probation.

-21-

Swenson was later brought before the circuit court on June 11, 2019, for a preliminary hearing to schedule revocation proceedings, and to provide Swenson information regarding the nature of those proceedings. Whereupon, after being Mirandized,[10] Swenson represented that she had never used methamphetamine during her probation and that the positive result to the contrary must have occurred because she had been taking Zantac "which [her] experience had shown" could cause a false positive. She also claimed the detention center personnel responsible for collecting her drug screen sample had tampered with it by mixing it with another inmate's sample:

> SWENSON: During this drug test that was done at the jail, I watched, I took another test with a woman and I watched the nurse, um, combined our tests together when she sent it off to the lab. Because Ms. Clover was the one that watched–
>
> COURT: We'll need to subpoena that witness. Is she willing to be charged with tampering with evidence?
>
> SWENSON: I have no idea. But I produced a full cup of urine, and the other woman did not.
>
> COURT: Why didn't you tell me that the first time instead of the Zantac story?
>
> SWENSON: Well, because that is, I was, I'm on Zantac and I mean—
>
> COURT: You're not helping yourself here.

---

[10] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

On June 25, 2019, the circuit court held the hearing with respect to the Commonwealth's motion to revoke Swenson's probation. There, Officer Payne testified consistently with his report. And Swenson, for her part, admitted to relapsing with methamphetamine on "the week of May 30th."

However, when pressed by the circuit court on this point, particularly in relation to her inability to produce a specimen for drug testing on May 30, 2019, and her failure to report for drug testing on May 31, 2019, Swenson then specified she had only used methamphetamine on one occasion and on the date of June 3, 2019.

Swenson also testified that June 3, 2019, had been the first occasion she had used methamphetamine since December 2017 – testimony the circuit court found dubious. During the hearing, it reminded Swenson of her earlier admissions that her use of methamphetamine had motivated her criminal conduct and that in her guilty plea she had admitted committing several of her felonies and misdemeanors in January and February 2018.

Swenson testified that after she had failed to report for drug testing on May 31, 2019, she had left Officer Payne two voicemails over the next few days[11]

---

[11] Officer Payne testified the only contact he received from Swenson between May 30, 2019, and the date of her arrest consisted of one voicemail message. He recalled receiving it the day before she was arrested.

and that because he had not returned her phone calls, she had assumed her failure to report was not any cause for concern. She admitted, however, that her failure to report was a violation of her probation.

With respect to her recent charges in Indiana, Swenson insisted that while her case remained ongoing, she was innocent and the case against her would inevitably be dismissed in her favor.[12] As to why she never informed her probation officer of her arrest, she testified:

SWENSON: I waited for him to call me.

COURT: Why?

SWENSON: Because I was under the miscommunication that I was supposed to let him know when I pled guilty.

COURT: No. That's not in the papers you signed. Okay? Not a miscommunication from him. That's in the papers that I know you signed. You tell them. They don't do things for you, you tell them. Because they can't keep up with people being arrested in another state. You're supposed to tell them within 72 hours because if something like that is going on, it may indicate that there needs to be a change in the probation, get somebody to treatment. There's all kinds of things that need to happen. So that was your mistake, right?

SWENSON: Yes, sir.

---

[12] The record only indicates Swenson's Indiana charges are misdemeanor public intoxication and reckless driving, and that the case against her remains ongoing.

Over the course of the hearing, the circuit court exhaustively reviewed the nature of Swenson's criminal offenses, as well as the details of what had transpired during her probation, including what is set forth above. Upon the conclusion of the hearing, Swenson's counsel argued:

> Well, your honor, it's clear that she violated the terms of her probation, but I would ask the court to give her a sanction. She did go for a period of time where she had no positive drug screens. There's only been essentially one here, recently, as far as a positive drug screen. We know that she's got the ability to go for long stretches of time without using drugs. Um, I would suggest to the court that the court just give her a sanction of up to twelve months, if the court would be inclined to suspend part of that sanction on the condition that she complete a long-term rehab I would ask for that as well.

Conversely, the Commonwealth advocated revoking Swenson's probation:

> Judge, this is not the first time we've been here. In fact, the last time we were here, she was given, I have words to the effect of strict compliance, she was put on weekly progress reports. That wasn't, that wasn't even a year ago. She's someone who, I think, is trying to do probation on her own terms and I don't think has been entirely truthful. I've heard her use the phrase, "I'm gonna be honest with you," about ten times. It concerns me when I hear someone use those words because, obviously, there may be a lot of dishonesty when she has to clarify when she's being honest. But, I have some concern that she would complete any type of treatment offered to her. She's had multiple types of treatment offered. Drug court did not work. PSAP, she's not eligible for. I don't think there's anything that's going to keep her from being a danger to herself or the community

other than incarceration. She's in violation of her probation, I don't think she can be managed, I don't think that she's going to adhere to anything, she's shown no willingness to adhere to anything, and just continuously making excuse after excuse. So, I think that her probation should be deemed violated and she should serve her term.

On July 8, 2019, the circuit court entered its order revoking Swenson's probation. The findings and conclusions set forth in its order were as follows:

### FINDINGS OF FACT

The defendant failed to abide by the terms and conditions of probation by committing the following violations:

1. failure to complete treatment, continued drug use.
2. new charges out of Indiana.

### CONCLUSIONS OF LAW

The Defendant was afforded the opportunity for a hearing pursuant to KRS 533.050. In determining whether to revoke the Defendant's probation or to assess a penalty or conditions other than revocation, the Court has considered the requirements of KRS 439.3106 and finds: Such violation(s) constitute a significant risk to prior victims of the Defendant or the community at large (including the Defendant) and cannot be appropriately managed in the community. *As stated in detail on the record*, the Courts have tried multiple treatment facilities and drug court. The Defendant will not engage in any long-term treatment plan. She will continue with manipulation and dishonesty. Her drug use will lead to more thefts.

(Emphasis added.)

-26-

As emphasized, however, the circuit court's order incorporated more detailed oral findings and conclusions given from the bench during the conclusion of the June 25, 2019 hearing. Those findings and conclusions were as follows:

> COURT: I guess ultimately here's what I have to decide. There's no question she violated her probation in multiple ways. I mean, I could list the different ways. But here's the rules, here's the law about this. I have to decide, is her conduct in violation of her probation, does that represent a danger to prior victims or a danger to the community including herself? Well, yeah, it actually does. If somebody's been through that much treatment, I mean we've been through everything, treatment, drug court, re-NEST, all of these things, Trilogy, and a lot of it is self-destructive behavior on her part. Then, things blow up again, right? So, my finding would have to be, yes it is. And here's why. Eventually, if you did relapse on meth, and you start going down that road again, it's just a matter of time before you're gonna steal something else—
>
> SWENSON: That's why I asked for help.
>
> COURT: Yeah. And I gave you help.
>
> SWENSON: Yes, sir, I mean—
>
> COURT: More than once. But here's the problem. Here's the thing. Yes, I think you would be a danger to yourself. If you were still out on probation, you would either be a danger to yourself or other people in the community or you're going to commit, eventually go back to committing crimes, probably related to theft to feed a drug addiction again. See, the second part is the part I've been trying to find an answer to because that is, "Judge, do you believe this person can be appropriately managed in the community?" I have to find that they

-27-

cannot be appropriately managed in the community in order to revoke probation.

That's why I've spent all this time, I didn't want to waste anybody's time, and I know it got frustrating to listen to me asking and going through all of this. People get tired of it, but I'm the one who has to decide this. And I want to make sure I leave no stone unturned and say, "What on Earth can we do now?"

And the answer is nothing. I'm sorry to say, but nothing. We've gone through all the different things that we can try. And what I'm being asked to do, this is what's really telling me something, is to say, "Well, I've made an IOP appointment," or "I've done this, and I want to do this." It's not enough. It's too little, too late, and it isn't going to solve the problem. It just isn't. So, it's really difficult for me to sit back and say, you know, you had this chance to avoid a really powerful, long sentence, and more than one chance was given, and you just keep blowing it.

And I have to agree with part of what I heard here, you know, you're good at finding excuses. You're good at saying, "Well this, but this and this." And "This person did that." And "Listen, that's really not what happened." If you aren't willing to take responsibility more than you are, no treatment I could come up with would work.

So, at the end of the day, you know, I thought about what defense counsel just said. Look, I could do this because a twenty-year sentence is tough. But once at 20%, you've got jail credit in, you're gonna be able to see the parole board in the not too distant future if I revoke your probation.

But I could, under the statute, revoke her probation and make her serve twelve months. What for? I can't send her to PSAP because she's blown that up. I can't send her to PSAP to get treatment while she's in for that 12

months, that she can't walk away from. She can't, you know, she has behavioral problems, they'll throw her out of that, too, but at least she won't just walk away and go do something else, drugs or anything else.

And I throw my hands up, in part, because I'm so very frustrated with it. I wish there was something more we could do, but I think she's been given a lot of chances and she's just blown them all. And I am not going to waste any more resources. There are other people who can go with the types of treatments that I can do that might actually want to do it and are not just playing me. My decision, then, based on what I've said, is that probation is revoked.

In short, after once again reviewing Swenson's criminal history and the course of her various probations, the circuit court revoked Swenson's probation after concluding the pattern of behavior that had led Swenson to commit a multitude of criminal offenses had not changed and that Swenson's behavior had indeed prevented her from receiving treatment absent incarceration: She had undergone treatment only when forced to do so; she had only put forth minimal effort during treatment; given the choice, and to her detriment, she had chosen freedom over continued drug treatment; and she had remained unwilling to accept responsibility.

Swenson now appeals. First, she asserts the circuit court misunderstood the record when it indicated in its oral findings that she had "been through everything, treatment, drug court, re-NEST, all of these things, Trilogy." Specifically, Swenson notes that, ultimately, she was never enrolled in the felony

-29-

drug court program; she argues her "departure from reNEST [sic] for Serenity Place was legitimately due to the latter facility's ability to accommodate her pregnancy"; and she notes that the circuit court had already considered the fact that she had been assessed nineteen behavior contracts against her at Trilogy, and had previously rejected it as a basis for revoking her probation. Accordingly, she argues, those details cannot support the circuit court's determination, in its July 8, 2019 order, that she violated her probation.

To be clear, however, the circuit court never insinuated Swenson had ever enrolled in the *felony* drug court program; it was referencing her self-termination from the *misdemeanor* drug court program. And, nothing of record indicated re-NEST was "unable to accommodate" any medical issues Swenson may have had; by Swenson's own admission, she left that facility because she did not wish to restart their program and desired a quicker treatment option.

More to the point, the circuit court did not cite those events, or the nineteen behavior contracts assessed against Swenson during her stay at Trilogy, to support the notion that she *violated* her probation for purposes of its July 8, 2019 order. It did so because, among other things, KRS 439.3106 requires trial courts to determine whether a probationer can be "managed in the community before probation may be revoked." *Andrews*, 448 S.W.3d at 780. As discussed at length in this opinion, the circuit court considered those events, along with the many other

-30-

events outlined above, and inferred she could *not*. For the sake of brevity, we will not repeat the breadth of the circuit court's analysis in that respect; suffice it to say, its inferences were reasonable, and its finding was not an abuse of discretion.

Swenson also asserts, once again, that her reckless driving and public intoxication charges in Indiana will be dismissed because she is innocent. But, this point is irrelevant for at least two reasons: (1) nothing of record indicates those charges *have* been dismissed; and in any event, (2) in citing "new charges out of Indiana" as a violation of Swenson's probation, the circuit court was not referencing Swenson's *guilt*, but her failure to *report* those charges to her probation officer.

Swenson also likens herself to the appellant in *Helms v. Commonwealth*, 475 S.W.3d 637 (Ky. App. 2015). There, she notes, appellant Helms' probation was revoked after he tested positive for methamphetamine on one occasion, and the revocation was ultimately deemed an abuse of discretion because it had resulted from a court-enforced "zero-tolerance" provision. Swenson points out that she, too, only tested positive for methamphetamine on one occasion before her probation was revoked and that during her April 27, 2018 sentencing hearing the circuit court told her, "If you don't complete [drug treatment], not only are you not going to get into drug court, you'll be terminated from that, you're

going to prison for twenty years," which she believes is akin to a "zero-tolerance" provision.

However, "one positive test for methamphetamine" is the only similarly between Swenson and Helms. For example, Helms was on pretrial felony diversion for a first offense and deemed a "low-risk" offender prior to his revocation. *Id*. at 639. Swenson, on the other hand, was on probation after having already been sentenced to twenty years' imprisonment for twenty felony and misdemeanor offenses – none of which was her first offense – and was deemed "high-risk."[13]

Prior to revocation, Helms' probation officer never considered giving him any type of graduated sanction because the trial court had inserted a "zero-tolerance" provision in its pretrial diversion order. *Id*. Here, no "zero-tolerance" provision was ever added to any written order of record; each of Officer Payne's reports contemplated assessing graduated sanctions; and Officer Payne *did* assess Swenson a graduated sanction for her failure to report her Indiana charges. Indeed, the circuit court did not revoke Swenson's probation on August 20, 2018, *despite* its determination that Swenson's conduct at Trilogy had violated her probation. And in both its August 20, 2018, and July 8, 2019 orders, the circuit court carefully

---

[13] The circuit court set forth its determination that Swenson was a "high risk" offender in an April 2, 2018 order.

-32-

explained why it did or did not revoke her probation – not due to any immutable policy, but due to what it perceived was Swenson's ability to be managed in the community.

Helms was also characterized by his probation officer as "cooperative"; he did not contest his violations; he admitted responsibility for his violations; nothing of record demonstrated he was unwilling to be effectively managed during probation; and he testified to his willingness to "begin his entire period of pretrial diversion anew." *Id*. at 640.

By contrast, the circuit court here reasonably inferred from Swenson's testimony, Officer Payne's testimony, and the various reports of record that Swenson was uncooperative. As discussed above, Swenson downplayed or contested her violations, and on at least one occasion – *i.e.*, June 11, 2019, when she denied using methamphetamine at all – instead blamed her positive result on "Zantac" or the malfeasance of jail personnel. Furthermore, on at least two occasions (namely, when she voluntarily terminated her participation in misdemeanor drug court in May 2016, and when she chose to leave re-NEST for Serenity Place), Swenson demonstrated she had more interest in freedom than a longer term of treatment. And following both of those occasions, she relapsed within three months.

In other words, *Helms* does not reflect the circuit court committed any error in this matter.

Lastly, Swenson contends the circuit court's factfinding was inadequate. Again, we disagree. From its written and oral findings, the circuit court specified Swenson had violated her probation by: (1) failing to report her charges in Indiana; (2) failing to report to her probation officer for mandatory drug testing; and (3) testing positive for methamphetamine – violations Swenson does not contest. It carefully considered the additional necessary factors required by KRS 439.3106. And considering the record, the circuit court's findings were clearly not an abuse of its discretion.

Accordingly, we AFFIRM.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Roy Alyette Durham II
Assistant Public Advocate
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General
Frankfort, Kentucky